# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| MILTON BUCKNER III, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:13 CV 398 AGF / DDN |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Milton Buckner for disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. § 401, et seq. and for supplemental security income under Title XVI of the Social Security Act, 42 U.S.C. § 1381, et seq. The action was referred to the undersigned United States Magistrate Judge for review and a recommended disposition under 28 U.S.C. § 636(b). For the reasons set forth below, the decision of the Administrative Law Judge should be affirmed.

## I. BACKGROUND

Plaintiff Milton Buckner III, born October 31, 1960, applied for Title II and Title XVI benefits on March 10, 2010. (Tr. 391-402.) He alleged an onset date of disability of April 4, 2009, due to pinched nerve in the neck, anxiety, panic attacks, chronic pain, disorientation, depression, ruptured left Achilles tendon, blurry vision, and arthritis in the left leg, arm, hand, and knuckles. (Tr. 391-402, 493-504.) Plaintiff's applications for Title II and Title XVI benefits were denied initially on May 18, 2010, and he requested a hearing before an ALJ. (Tr. 332-36, 342-43.)

On June 22, 2011, following a hearing, the ALJ found plaintiff not disabled. (Tr. 280-92.) On January 25, 2013, the appeals council denied plaintiff's request for review. (Tr. 1-4.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  MEDICAL HISTORY

On October 25, 2007, plaintiff arrived at the emergency room, complaining of neck and head injuries and numbness in his left arm caused by the cargo door of the airplane falling on his head due to a faulty hydraulic hinge.  Head CT scans revealed no evidence of acute intracranial abnormality, cervical spine CT scans revealed no evidence of acute fracture or distraction but revealed two calcified nodules in the right thyroid lobe, and multiple reactive-sized submandibular lymph nodes.  (Tr. 677-85, 773-75.)

On November 3, 2007, plaintiff arrived at the emergency room, complaining of left neck pain and left arm numbness and pain despite his prescriptions for Vicodin and ibuprofen.  Plaintiff's medications also included Crestor and Klonopin, and he wore a soft collar.[1]  The impression of Anson Cheng, M.D., was cervical strain and radiculopathy, and he prescribed Percocet and Flexeril.[2]  (Tr. 675-76.)

On November 5, 2007, an MRI scan of the cervical spine revealed no disc herniation or stenosis.  (Tr. 674.)

On November 7, 2007, Sheryl D. Gale, M.D., recommended that plaintiff continue wearing the soft collar and taking his pain medication.  She recommended that he refrain from work until his reevaluation.  (Tr. 769-71.)

On November 27, 2007, Dr. Gale noted that plaintiff's employment consisted of loading and unloading airplanes.  She assessed cervical sprain with radiculopathy, left arm pain, thyroid nodules, hypertension, posttraumatic stress disorder, and depression.  She recommended a thyroid ultrasound and physical therapy and prescribed methocarbamol.[3]  She further recommended that he refrain from work until further reevaluation.  (Tr. 764-66.)

On December 12, 2007, a thyroid ultrasound revealed two solid vascular nodules in the right lobe.  Dr. Gale recommended thyroid biopsies to test for cancer.  (Tr. 761, 954.)

---

[1] Crestor is used to lower bad cholesterol and fats and raise good cholesterol in the blood. WebMD, http://www.webmd.com/drugs (last visited on January 23, 2013).  Klonopin is used to prevent and control seizures.  Id.

[2] Percocet is used to treat pain.  WebMD, http://www.webmd.com/drugs (last visited on January 23, 2013).  Flexeril is used short-term to treat muscle spasms.  Id.

[3] Methocarbamol is used to treat muscle spasms/pain.  WebMD, http://www.webmd.com/drugs (last visited on January 23, 2013).

On December 18, 2007, plaintiff complained of continued neck pain exacerbated by quick movements and occasional left arm pain. Dr. Gale excused him from work until February 1, 2008 and emphasized the importance of physical therapy and exercise. Plaintiff also complained of posttraumatic stress disorder due to the cargo door accident, and Dr. Gale referred plaintiff to mental health. She assessed neck and left shoulder pain, anxiety, posttraumatic stress disorder, dyspepsia, and thyroid nodules and prescribed omeprazole.[4] (Tr. 757-59.)

On December 27, 2007, Harold Cable, M.D., could not complete the biopsy of plaintiff's thyroid due to calcification, although he obtained some fluid. However, he found the fluid insufficient for further evaluation. (Tr. 672-73.)

On January 22, 2008, plaintiff received physical therapy, complaining of pain on the left side of the neck, shoulder, and arm. (Tr. 670-71.)

On January 24, 2008, after consulting with an endocrinologist, Dr. Gale recommended a partial thyroidectomy. (Tr. 751-52.)

On January 28, 2008, Dr. Gale assessed left elbow pain, neck pain, and thyroid nodules. She scheduled an endocrinology consultation for plaintiff. (Tr. 747-49.)

On January 20, 2008, K.C. Kaltenbron, M.D., an endocrinologist, diagnosed calcified right thyroid nodule with cancer risk factors and recommended a right thyroidectomy. (Tr. 668-69.)

On February 1, 2008, Dr. Thad C. Stanford performed an independent medical evaluation on plaintiff. Plaintiff reported that he had ruptured an Achilles tendon that had been repaired years ago. He was employed by ERA Aviation as a cargo attendant. Dr. Stanford's impressions included severe left neck and shoulder contusions and possible nerve root irritation or contusion in the upper left arm. He opined that the October 25, 2007 incident caused plaintiff's injuries. He recommended further physical therapy and additional tests, including nerve conduction study and MRI scans of the neck and left arm. (Tr. 663-66.)

On February 13, 2008, Dr. Brian D. Affleck, diagnosed right thyroid mass with calcification. He recommended a right hemi-thyroidectomy, CT scan of the neck with contrast, and thyroid-stimulating hormone testing. (Tr. 579-82.)

---

[4] Omeprazole is used to treat certain stomach and esophagus problems. WebMD, http://www.webmd.com/drugs (last visited on January 23, 2013).

On February 21, 2008, a neck CT scan revealed two right thyroid nodules calcified in a typically benign pattern. (Tr. 658.)

On February 28, 2008, Dr. Gale noted that the thyroidectomy had been scheduled. She also noted that plaintiff had not regained function in his left arm. She assessed thyroid nodules and persistent loss of left arm strength and motion. She also noted plaintiff's groggy state and decided to taper methocarbamol and oxycodone. (Tr. 744-45.)

On March 14, 2008, an MRI scan of the brain revealed possible edema to the occipital love, indicating a mild injury, and mucosal thickening in the maxillary sinuses, indicating possible sinusitis. An MRI scan of the left arm revealed a possible paralabral cyst, mild degenerative changes of the right joint, but no rotator cuff tear. An MRI scan of the cervical spine revealed no irregularities. (Tr. 949-52.)

On March 31, 2008, plaintiff received preoperative counseling for the scheduled thyroidectomy. Dr. Affleck recommended that plaintiff proceed with the thyroidectomy. (Tr. 576-77.)

On April 9, 2008, plaintiff underwent a thyroidectomy. He was discharged the following day. (Tr. 571-75.)

On April 10, 2008, Dr. Gale opined that the cyst revealed by the left arm MRI explained the shoulder pain. Plaintiff also reported decreased alertness despite tapering his pain medication. Dr. Gale assessed partial thyroid resection, persistent left shoulder pain, anxiety, and decreased alertness. She prescribed Vicodin for pain, recommended a neurology consult, and referred plaintiff to the mental health clinic to evaluate his medication. She also recommended that he refrain from working for two more months. (Tr. 739-41.)

On May 5, 2008, plaintiff complained of paresthesias from the left neck to the fingers and pain in the left elbow. The impression of Logan B. Hull, PA-C, was left shoulder pain and arthropathy. He recommended a steroid injection and requested X-rays of the left shoulder, elbow, and cervical spine. (Tr. 736-37.)

On May 20, 2008, nerve conduction studies revealed no electrodiagnostic evidence of a cervical radiculopathy affecting plaintiff's left arm. (Tr. 648-49.)

On June 25, 2008, plaintiff reported that the subacromial bursa injection did not relieve his shoulder pain. Mr. Hull recommended an acromioclavicular joint injection. (Tr. 731-32.)

On July 1, 2008, plaintiff complained of sharp pain in the left arm exacerbated by change of position. Dr. Gale noted short term memory loss and that patient could not recall his visit with Mr. Hull earlier that week. Dr. Gale assessed neck and left arm pain, depression, memory loss, and parathyroid adenoma with resection. Plaintiff declined physical therapy, stating that it caused him to feel worse. Dr. Gale replaced Motrin with Sulindac and prescribed Prozac.[5] (Tr. 729.)

On July 21, 2008, plaintiff complained of left arm pain and intermittent blurry vision. He also reported forgetfulness regarding tasks and taking his medication. Gregg Meekins, M.D., found no evidence of nerve injury but did not exclude mild cognitive impairment. Dr. Meekins recommended comprehensive neuropsychometric testing and another MRI scan of the brain. Plaintiff discontinued omeprazole and naproxen.[6] (Tr. 723-27.)

On August 1, 2008, Dr. Gale had not yet cleared plaintiff to return to work, stating that he awaited the tests results necessary to rule out traumatic brain injury. Plaintiff stopped taking Prozac, complaining that it caused him to feel flat. Dr. Gale prescribed Etodolac and omeprazole and assessed chronic neck and left shoulder pain, memory loss, hypertension, and depression.[7] Plaintiff declined physical and psychiatric therapy. (Tr. 719-21.)

On August 4, 2008, plaintiff arrived at the emergency room, complaining of neck pain caused by a motor vehicle accident in which he rear-ended another vehicle. He was assessed with a neck strain and was prescribed hydrocodone. (Tr. 644-47.)

On August 7, 2008, an MRI scan of the brain revealed mild increase in the mucosal thickening in the maxillary sinuses but no new or acute process in the occipital lobe. (Tr. 945.)

On September 2, 2008, Dr. Gale informed plaintiff that the brain MRI was normal. Plaintiff complained of continued left shoulder pain. Dr. Gale refrained from clearing plaintiff for work pending the result of neuropsychological tests. (Tr. 717-18.)

---

[5] Sulindac is used to reduce pain, swelling, and joint stiffness from arthritis. WebMD, http://www.webmd.com/drugs (last visited on January 23, 2013). Prozac is used to treat depression and panic attacks. Id.

[6] Naproxen is used to relieve pain from various conditions such as headaches, muscle aches, and arthritis. WebMD, http://www.webmd.com/drugs (last visited on January 23, 2013).

[7] Etodolac is used to relieve pain from various conditions, including arthritis. WebMD, http://www.webmd.com/drugs (last visited on January 23, 2013).

On January 9, 2009, plaintiff reported that he moved from his apartment and sold his truck due to insufficient funds but that he received workers' compensation payments. Plaintiff complained of left heel pain, explaining that he worked as a janitor and that walking for long periods caused the pain. Left heel X-rays revealed mild thickening of an intact Achilles tendon. He also complained of nightmares relating to his wartime military service and requested counseling. Plaintiff's medications included clonazepam, vardenafil, and rosuvastatin.[8] Dr. Gale assessed traumatic brain injury with short term memory loss, heel pain, hyperlipidemia, right thyroidectomy, posttraumatic stress disorder, and dysuria. She reordered neuropsychological testing, prescribed Crestor, and recommended meeting with a social worker and remaining active. (Tr. 706-11, 944.)

On January 14, 2009, plaintiff complained of sharp left heel pain that began nine months earlier. Thomas Shields, D.P.M., assessed pes planus with secondary plantar fasciitis.[9] Dr. Shields prescribed Feldene and administered an injection in plaintiff's left heel.[10] (Tr. 701-04.)

On February 10, 2009, plaintiff reported difficulty since his October 2007 injury, including pain, inability to return to his cargo attendant position, moving into a shelter, snappiness, and depression. Gary N. Muramoto, L.C.S.W., noted that plaintiff appeared ambivalent about engaging in mental health treatment. Plaintiff stated that obtaining employment would alleviate his problems and that he had a job prospect. Plaintiff also reported that he quit his janitorial job due to his medical condition and that he suffered joint pain at the base of his left thumb. Dr. Gale recommended X-rays. (Tr. 695-97.)

On February 20, 2009, left hand X-rays revealed degenerative change in the interphalangeal joint of the thumb, minimal degenerative change in the first metacarpophalangeal joint, and a small benign cyst on the middle finger. Plaintiff complained of increased thumb pain and swelling. Dr. Gale assessed mild arthritis and a benign cyst. (Tr. 692, 694-95, 943.)

---

[8] Clonazepam is also known as Klonopin. WebMD, http://www.webmd.com/drugs (last visited on January 23, 2013). Vardenafil is used to treat male sexual function problems. Id. Rosuvastatin is also known as Crestor. Id.

[9] Pes planus is also known as flatfoot. Stedman's Medical Dictionary, 1468 (28th ed., Lippincott Williams & Wilkins 2006) ("Stedman").

[10] Feldene is sued to reduce pain, swelling, and joint stiffness from arthritis. WebMD, http://www.webmd.com/drugs (last visited on January 23, 2013).

On March 9, 2009, Dr. Shields assessed pes planus with secondary plantar fasciitis and keloid formation from prior Achilles tendon repair. He also prescribed Vicodin. (Tr. 686-88.)

On April 9, 2009, plaintiff arrived at the emergency room, complaining of anxiety and hearing voices. Plaintiff reported that he had relocated permanently from Alaska to St. Louis and that he had exhausted his supply of clonazepam, which caused panic attacks. Arthur C. Sippo, M.D., diagnosed agoraphobia and prescribed clonazepam. (Tr. 780-91.)

On April 29, 2009, plaintiff reported regular panic attacks, including sense of impending doom, fast heartbeat, and feeling faint. He stated that the panic attacks began ten years earlier. He returned to St. Louis due to his mother's health, indicating that she was on life support at a hospital. He reported that he worked as a rations clerk but that, during one day, he exhausted his clonazepam, suffered a panic attack, offended an inspector, and asked to resign. He reported a divorce fifteen years earlier and no contact with his four children. He also spent time in prison from 1985 to 2000 for murder, and his criminal record complicates obtaining employment. He also served as a Marine. Plaintiff further reported some alcohol use but no other drug or tobacco use. Peggy Gleason, RN, assessed panic disorder and a GAF score of 50.[11] She replaced clonazepam with diazepam and prescribed citalopram.[12] (Tr. 831-36.)

Also on April 29, 2009, plaintiff reported that he had worked at Permacel Motor as a machine operator who drove forklifts. He reported that he spent the prior night sleeping in a car with an open back door. (Tr. 862-65.)

On April 30, 2009, plaintiff complained of bone pain on the left side of his body, panic disorder, depression, and joint pain. Francis X. Jana, M.D., assesses anxiety and degenerative

---

[11] A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worse of the two components.

A GAF score from 41 to 50 represents serious symptoms (such as thoughts of suicide, severe obsessional rituals, frequent shoplifting), or any serious impairment in social, occupational, or school functioning (such as the inability to make friends or keep a job). American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 32–34 (4th ed. 2000) ("DSM-IV-TR").

[12] Diazepam is used to treat anxiety, acute alcohol withdrawal, and seizures. WebMD, http://www.webmd.com/drugs (last visited on January 23, 2013). Citalopram is used to treat depression. Id.

joint disease. He prescribed dicloflenac.[13] X-rays of the left hand, left ankle, and cervical spine revealed no bony or joint abnormalities. (Tr. 803-05, 892-94.)

On May 8, 2009, plaintiff arrived at the emergency room, requesting clonezapam and stating that Valium did not help but caused disorientation and drowsiness. Ibe O. Ibe, M.D., discontinued Valium and prescribed Klonopin.[14] (Tr. 848-52.)

On May 14, 2009, plaintiff complained of pain in the joints, leg, arm, and hand. Dr. Jana assessed degenerative joint disease and anxiety and prescribed Lodine and gabapentin.[15] Left elbow X-rays revealed no bony or joint abnormality. (Tr. 846-48.)

On May 18, 2009, plaintiff described himself as struggling with anger and violence. He reported that he quit his post office job after six weeks and abandoned a postal truck in an alley. (Tr. 844.)

On June 5, 2009, plaintiff complained of sharp and aching left ankle pain that walking and weight exacerbated. He stated that he could not stand for longer than three hours due to the pain and that the pain prevents him from working. Stuart L. Frankel, D.P.M., noted that plaintiff received three cortisone injections in the foot during the past year, which plaintiff found unhelpful. Dr. Frankel assessed left ankle pain, tenosynovitis, plantar fasciitis, and flatfoot. He ordered an MRI and a moonboot to be worn while walking. Left foot X-rays revealed no fracture, dislocations, or other bony abnormalities. (Tr. 801, 820-23.)

On June 18, 2009, plaintiff complained of severe pain from his foot to his back and that the pain caused depression. He reported that he lived with family members and that citalopram caused nausea. Ms. Gleason prescribed sertraline, discontinued citalopram, and assessed a GAF score of 50.[16] (Tr. 837-40.)

---

[13] Dicloflenac is used to relieve pain, swelling, and joint stiffness caused by arthritis. WebMD, http://www.webmd.com/drugs (last visited on January 23, 2013).

[14] Valium is also known as diazepam. WebMD, http://www.webmd.com/drugs (last visited on January 23, 2013).

[15] Lodine is also known as etodolac. WebMD, http://www.webmd.com/drugs (last visited on January 23, 2013). Gabapentin is used to prevent and control seizures. Id.

[16] Sertraline is used to treat depression, panic attacks, posttraumatic stress disorder, and social anxiety disorder. WebMD, http://www.webmd.com/drugs (last visited on January 23, 2013).

On July 8, 2009, Elbert H. Cason, M.D., performed a general medicine evaluation. Plaintiff reported that he walks with a cane, that he can walk one or two blocks, stand for thirty minutes, and climb two flights of stairs, He cannot complete a squat but can bend. He can write and performs household chores. He does not drive but leaves his home about twice per week. His medications included Clorazapan, Crestor, Xoloft, Amitriptline, and Darvan.[17] Dr. Cason's impression was history of left Achilles tendon rupture, heel spur, decreased motion of the left ankle and knee, and that plaintiff was overweight. He also found that despite plaintiff's alleged left hand and arm arthritis, plaintiff's left arm had the normal range of motion and his left hand had normal grip strength. (Tr. 916-21.)

Also on July 8, 2009, Summer D. Johnson, Psy.D., performed a psychological evaluation on plaintiff. Plaintiff reported that although he received workers' compensation for the cargo door injury, he filed a lawsuit. He stated that his anxiety began when he contemplated the activities he can no longer perform. He reported that he became unconscious while driving and drove his vehicle off the road. He blacks out two or three times per month. He feels a sense of impending doom. Plaintiff also complained of depression due to the loss of his independence and a sense of purposelessness. Pain causes difficulty sleeping, and he has low self-esteem. He overeats and has gained weight. He also complained of his suspicions that people intend to harm him for his conduct during his youth. (Tr. 922-26.)

He reported that he lived with his parents but stayed at Jefferson Barracks on occasion. He rarely drives due to the panic attack he experienced while driving. He cannot shop for groceries due to leg pain. Dr. Johnson found plaintiff's concentration and pace well below normal limits. She diagnosed moderate, single episode, major depressive disorder, and panic disorder without agoraphobia and assessed a GAF score of 52.[18] She found his prognosis to be fair with appropriate treatment and compliance. (Id.)

---

[17] Zoloft is also known as sertraline. WebMD, http://www.webmd.com/drugs (last visited on January 23, 2013). Amitriptyline is used to treat mental/mood problems such as depression. Id. Darvon is used to treat pain. WebMD, http://www.webmd.com/pain-management/news/20101119/darvon-darvocet-banned (last visited on January 23, 2013.)

[18] A  score from 51 to 60 represents moderate symptoms (such as flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (such as few friends, conflicts with peers or co-workers). DSM-IV-TR at 34.

On July 20, 2009, plaintiff complained of continued leg pain. Dr. Jana assessed anxiety, degenerative joint disease, and hypercholesterol. Although the moonboot ordered for plaintiff had arrived, plaintiff failed to pick it up. (Tr. 1053-54.)

On August 20, 2009, plaintiff complained of a sense of impending doom, depression, hearing voices, and purposelessness. He reported that sertraline did not help. Ms. Gleason prescribed bupropion and quetiapine.[19] Plaintiff scheduled a meeting with another social worker but noted transportation as a possible problem. (Tr. 1047-51.)

On August 25, 2009, plaintiff complained of foot and ankle pain and an upset stomach. Dr. Jana prescribed Darvocet. Plaintiff also complained of purposelessness but expressed hope. He complained that codeine did not alleviate his pain but upset his stomach. Peter A. Brawer, Ph.D., noted that although plaintiff reported that he took clonazepam as directed, drug screening indicated the presence of no benzodiazepines. Drug screening also confirmed plaintiff's denial of drug abuse. Dr. Brawer found further visits to the psychology clinic unnecessary due to the care of Ms. Gleason and social worker Edwyna Trowler. (Tr. 1039-40.)

On September 28, 2009, Dr. Jana admonished plaintiff for missing six appointments since June 4, 2009, including consultations for podiatry, prosthetics, and mental health, and MRI appointments. Plaintiff expressed dissatisfaction with Dr. Jana and reported panic attacks of increased severity. (Tr. 1032-35.)

On September 29, 2009, plaintiff complained of continued depression and anxiety. Plaintiff reported that he had stopped taking sertraline due to medical instructions; however, Ms. Gleason indicated that plaintiff had misunderstood. He also stated that sertraline caused him anxiety. Plaintiff also reported trying one of his father's Xanax pills and that it helped.[20] He expressed frustration due to inability to work and stated that he lived with his brother. Ms. Gleason discontinued bupropion and sertraline and prescribed paroxetine.[21] (Tr. 1027-32.)

---

[19] Bupropion is used to treat depression. WebMD, http://www.webmd.com/drugs (last visited on January 23, 2013). Quetiapine is used to treat certain mental/mood conditions. Id.

[20] Xanax is used to treat anxiety and panic disorders. WebMD, http://www.webmd.com/drugs (last visited on January 23, 2013).

[21] Paroxetine is used to treat depression, panic attacks, anxiety disorders, and posttraumatic stress disorder. WebMD, http://www.webmd.com/drugs (last visited on January 23, 2013).

On October 14, 2009, plaintiff complained of severe headaches and pain in the neck that radiated down his arm to his fingers. He reported that he had four or five headaches per week that could last for two days. He stopped taking Tylenol 3 and etodolac because it upset its stomach. He reported incontinence during the past six months and that he has suffered panic attacks that cause unconsciousness for four years. He also stated that his mother recently died due to diabetes. Clyde R. Varner, M.D., assessed headache, possible concussion, and neck pain. He recommended continuing with pain management, neuropsychological testing, and nerve conduction study of the arm. (Tr. 1024-27.)

On October 27, 2009, plaintiff complained of feeling disorganized, forgetting whether he performed household chores, lack of focus during conversations, and forgetting important conversations. He cited falling out of his shower in 2004 as the origin of these symptoms. He awoke in the hospital and learned that he suffered a panic attack. He reported that his lived with both parents, has no contact with his siblings, has never married, and has no children. He reported that he completed high school and worked as a machine operator, quality control inspector, building inspector, and metal worker. He also stated that he had no driver license and that his parents supported him. Mardi M. Smith, M.S., indicated that plaintiff performed with inconsistent effort during testing, which led to invalid results. Mr. Smith strongly recommended that plaintiff continue mental health treatment. John R. Hogg, Ph.D., agreed with Mr. Smith's findings. (Tr. 1012-21.)

On October 30, 2009, plaintiff arrived at the emergency room, complaining of a headache that lasted for three days. He also complained of blurred vision and left arm tingling. Dr. Dennis Rudderow, M.D., prescribed Visteril.[22] (Tr. 1006-12.)

On November 6, 2009, plaintiff complained of headaches and blurred vision. Ms. Gleason suggested discontinuing paroxetine to determine whether it caused the headaches, but plaintiff declined. Ms. Gleason replaced clonazepam with alprazolam.[23] (Tr. 999-1004.)

On November 23, 2009, a nerve conduction study revealed no evidence of neuropathy or lumbosacral radiculopathy. (Tr. 997-99.)

---

[22] Vistaril is used to treat anxiety and skin inflammation. WebMD, http://www.webmd.com/drugs (last visited on January 23, 2013).

[23] Alprazolam is also known as Xanax. WebMD, http://www.webmd.com/drugs (last visited on January 23, 2013).

On December 18, 2009, a nurse indicated that plaintiff missed his appointment with Ms. Gleason on December 7, 2009.  (Tr. 1004.)

On January 13, 2010, plaintiff reported that paroxetine left him irritable but worked better than other medications.  Ms. Gleason increased plaintiff's paroxetine dosage.  He reported that he did not enjoy being around other people and felt left out due to his siblings relative success.  Ms. Gleason noted that plaintiff met the criteria for major depression.  (Tr. 990-94.)

On January 22, 2010, plaintiff complained of left ankle pain.  Dr. Jana noted elevated glucose and elevated blood pressure and prescribed Zestoretic.[24]  (Tr. 987-90.)

On January 25, 2010, plaintiff complained of continuous left heel pain and headaches. Steven R. Brenner, M.D., diagnosed headaches, neck pain, and ankle pain and recommended an MRI of the head and neck and a bone scan.  He also recommended a TENS unit.[25]  (Tr. 984-85.)

On February 4, 2010, a bone scan revealed degenerative changes in both ankle and metatarsophalangeal joints.  (Tr. 1070-71.)

On February 24, 2010, plaintiff complained of anxiety and requested alprazolam.  Ms. Gleason encouraged plaintiff to stay with clonazepam.  He also complained of poor sleep.  (Tr. 979-83.)

On March 9, 2010, plaintiff arrived at the emergency room, complaining of panic attack. He reported anxiety and increased stress and stated that he did not want to go into the examination room because he felt as though the walls were closing in on him.  He also reported shortness of breath and blurred vision and noted that conversing calms him.  Patrick McCann, M.D., prescribed Ativan.[26]  Plaintiff reported that he lived with his mother.  He also reported that he suffered four panic attacks during the past two months and that the symptoms had increased in severity.  He reported frequent anxiety, an impending sense of doom, and auditory hallucinations. (Tr. 970-79.)

---

[24] Zestoretic is used to treat high blood pressure.  WebMD, http://www.webmd.com/drugs (last visited on January 23, 2013).

[25] Transcutaneous electrical nerve stimulation (TENS) is a back pain treatment that uses low voltage electric current to relieve pain.  WebMD, http://www.webmd.com/back-pain/guide/tens-for-back-pain (last visited on January 23, 2013).

[26] Ativan is used to treat anxiety.  WebMD, http://www.webmd.com/drugs (last visited on January 23, 2013).

On March 10, 2010, an MRI scan of the brain revealed a small venous anomaly in the right cerebellar hemisphere, minimal white matter disease, and small mucus retention cysts in the left maxillary sinus. (Tr. 1067-70.)

On March 11, 2010, an MRI of the cervical spine revealed a small hemangioma involving the T2 vertebral body. (Tr. 1068.)

On March 17, 2010, plaintiff complained of difficulty reading small print and blurry vision. Donald E. Simpson, O.D., assessed borderline intraocular pressure. (Tr. 966-69.)

On April 6, 2010, plaintiff complained of neck pain that originated with the cargo door incident. Dr. Brenner diagnosed neck pain, prescribed Tylenol 3 and Robaxin, and recommended physical therapy.[27] He also noted skin sensitivity and keloids and referred plaintiff to dermatology. (Tr. 1380-82.)

On April 7, 2010, plaintiff reported increased depression and that he suffered a panic attack one month earlier. He also reported inconsistent sleep. He requested a referral to the pain clinic. (Tr. 1374-79.)

On April 16, 2010, plaintiff complained of throbbing ankle and leg pain. Plaintiff experienced the pain while resting, but standing exacerbated the pain. Plaintiff reported that he had worn a moonboot for about two years and walked for exercise. James D. Toombs, M.D., diagnosed left ankle pain and keloids. Dr. Toombs noted that plaintiff did not follow up with podiatry the prior year and doubted that plaintiff used the moonboot frequently due to the lack of wear and tear. He reordered the MRI, replaced etodolac with salsalate, recommending icing the ankle, and encouraged weight loss through diet and a pool-based exercise program.[28] (Tr. 1228-36.)

On April 30, 2010, Dr. Jana noted elevated glucose and elevated blood pressure. He prescribed losartan.[29] (Tr. 1362-64.)

---

[27] Robaxin is also known as methocarbamol. WebMD, http://www.webmd.com/drugs (last visited on January 23, 2013).

[28] Salsalate is used to relieve pain from various conditions, including arthritis. WebMD, http://www.webmd.com/drugs (last visited on January 23, 2013).

[29] Losartan is used to treat high blood pressure. WebMD, http://www.webmd.com/drugs (last visited on January 23, 2013).

On May 6, 2010, plaintiff received an MRI scan of the left ankle. Markus Lammle, M.D., noted that image artifacts degraded the image. He noted edematous changes in the subcutaneous soft tissues of the leg, moderate diffuse thickening in the Achilles tendon, and possible rupture of the anterior talofibular ligament. He founds the ankle X-rays normal. (Tr. 1171-74.)

On May 7, 2010, plaintiff met with Ilana Rosman, M.D., for hair loss and itchy bumps on the back of his scalp. Dr. Rosman diagnosed mild scalp folliculitis and androgenetic alopecia and prescribed cleocin, Lidex, and Rogaine.[30] (Tr. 1240-41.)

On May 17, 2010, Jeffrey Wheeler, M.D., submitted a Physical Residual Functional Capacity Assessment form regarding plaintiff. He found that plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand or walk at least two hours during an eight-hour workday, and sit for about six hours. He further found that plaintiff could only occasionally climb stairs, ramps, ladders, ropes, and scaffolds, balance, stoop, kneel, crouch, and crawl. Dr. Wheeler also questioned the medical necessity of plaintiff's cane use. (Tr. 1137-43.)

Also on May 17, 2010, Robert Cottone, Ph.D., submitted a Psychiatric Review Technique form regarding plaintiff. He found that plaintiff suffered depression and anxiety. He further found that plaintiff's had mild restrictions of daily living activities, moderate difficulties with social functioning and maintaining concentration, persistence, and pace, and one or two episodes of decompensation. Dr. Cottone found that plaintiff must avoid stressful interpersonal interaction but could perform simple work-related tasks. (Tr. 1144-55.)

Dr. Cottone also submitted a Mental Residual Functional Capacity Assessment form. He found that plaintiff's ability to perform, understand, and remember detailed instructions was markedly limited. He also found that the ability to maintain attention and concentration and the ability to work in coordination with others without distraction was moderately limited. He found the ability to work a normal work schedule at a consistent pace, the ability to accept instructions and respond appropriately to criticism from supervisors, and the ability to get along with coworkers to be moderately limited. Further, he found the ability to interact appropriately with the general public to be markedly limited. (Tr. 1156-58.)

---

[30] Cleocin is used to treat bacterial infections. WebMD, http://www.webmd.com/drugs (last visited on January 23, 2013). Lidex is used to treat a variety of skin conditions. Id. Rogaine is used to treat male pattern baldness. Id.

On May 18, 2010, Elizabeth Garcia-Rea, Ph.D., evaluated plaintiff for an anxiety management group. He reported that he avoided crowds or public places and that depression, purposelessness, and medical issues caused him stress. (Tr. 1358-59.)

On May 25, 2010, plaintiff reported that he went to Christian Northeast Hospital recently for a panic attack. He reported increased anxiety and depression, irritability, anger, and little hope. He had filed for disability benefits. Ms. Gleason assessed a GAF score of 45. (Tr. 1352-58.)

On June 1, 2010, plaintiff attended group behavioral therapy and active participated and interacted with the group. (Tr. 1351-52.)

On June 2, 2010, plaintiff called Dr. Brenner to complain that his pain medication did not alleviate his pain. Dr. Brenner replaced Tylenol 3 with Tylenol 4. (Tr. 1347-51.)

On June 8, 2010, plaintiff attended group behavioral therapy and actively participated and interacted with the group. (Tr. 1347.)

On June 9, 2010, Ms. Gleason observed a blunt affect. Plaintiff complained of depression, irritability, anxiety, and snappiness and reported that paroxetine did not help his depression. Ms. Gleason decided to taper the dosage and paroxetine and prescribed fluoxetine.[31] Plaintiff also attended behavioral therapy and actively participated and interacted with the group. (Tr. 1342-46.)

On June 15, 2010, plaintiff attended group behavioral therapy. He contributed to group conversation and listened attentively. (Tr. 1341.)

On June 17, 2010, plaintiff complained of left ankle pain and poor sleep. He reported wearing the moon boot eight to ten hours per day. He indicated that Tylenol 4 did not relieve his pain. Dr. Toombs stated that plaintiff did not keep his ankle MRI appointment allegedly due to anxiety. His impression was left ankle pain and keloids. He noted that drug screening indicated no use of opioids or benzodiazepines despite prescriptions for Tylenol 3 and 4, which contain codeine, and Klonopin. Dr. Toombs replaced Tylenol 4 with Tylenol and rescheduled an orthopedic consult. (Tr. 1334-40.)

---

[31] Fluoxetine is also known as Prozac. WebMD, http://www.webmd.com/drugs (last visited on January 23, 2013).

On July 1, 2010, plaintiff complained of a cough that began when he started losartan. The cough occasionally produced blood. Chest X-rays revealed no active disease. Kevin J. Wilson, PA-C, noted plaintiff's orthopedic appointment scheduled on July 16, 2010. He assessed hypertension, elevated lipids, degenerative joint disease, and chest pain. He replaced losartan with amlodipine, referred him to cardiology, and recommended an echocardiogram and a two-week blood pressure log.[32] (Tr. 1327-34.)

On July 13, 2010, plaintiff reported that he discontinued fluoxetine due to nausea and also stopped attending the group therapy sessions. He further reported that his family caused him stress. Ms. Gleason observed irritability and anxiety. Ms. Gleason discontinued fluoxetine. (Tr. 1322-27.)

On July 16, 2010, plaintiff complained of chronic left Achilles tendon pain and the pain caused by bumps on his left ankle. The impression of Kenneth R. Serby, M.D., was chronic Achilles tendonitis. Dr. Serby prescribed Hycodan but assessed plaintiff's condition as non-surgical.[33] (Tr. 1321-22.)

On July 27, 2010, plaintiff reported that he could not take Tylenol 4 due to nausea. Youngbin Choi, M.D., noted that lower extremity electromyography results indicated diabetic neuropathy. Plaintiff described the pain as continuous and exacerbated by movement. He also complained of a migraine. Dr. Choi indicated a negative neck MRI, and his impression was cervicular radiculopathy. He recommended a cervical nerve conduction study, and analgesic balm. (Tr. 1314-20.)

On July 29, 2010, plaintiff reported that he felt better, and Ms. Gleason observed laughter and brighter affect. He further reported that spending time away from his family calmed him and wanted to remain on his medication. Ms. Gleason assessed a GAF score of 55. (Tr. 1306-11.)

On August 4, 2010, plaintiff failed to appear for a cardiology appointment. (Tr. 1304-06.)

On August 25, 2010, a nerve conduction study indicated mild left ulnar entrapment neuropathy at the elbow but no evidence of left cervical radiculopathy. (Tr. 1299-1304.)

---

[32] Amlodipine is used to treat high blood pressure. WebMD, http://www.webmd.com/drugs (last visited on January 23, 2013).

[33] Hycodan is used to relieve a dry cough. WebMD, http://www.webmd.com/drugs (last visited on January 23, 2013).

On August 31, 2010, Rosemary Alexander Ledbetter, PA-C, indicated that plaintiff ambulated without use of an assistive device. She explained that orthopedics had little to offer for pain relief at this treatment stage. (Tr. 1300-02.)

On October 20, 2010, plaintiff complained of left ankle pain and neck stiffness. He reported that orthopedics told him that surgery was not an option. Kristina L. Henderson, M.D., noted plaintiff's tendency to miss appointments. She assessed hypertension, chest pain, hyperlipidemia, left ankle pain, neck pain, and obesity. She noted that Norvasc controlled his hypertension and that he wore the moon boot inconsistently. (Tr. 1394-99.)

On November 2, 2010, Marc S. Levin, M.D., diagnosed plaintiff with gastroesophageal reflux disease. (Tr. 1201-02.)

On November 4, 2010, plaintiff underwent a colonoscopy, which revealed polyps but was otherwise normal. (Tr. 1187-89.)

On November 19, 2010, plaintiff complained that clonazepam was no longer effective and reported that he had been taking his father's alprazolam prescription for the past three weeks and found it satisfactory. Ms. Gleason replaced clonazepam with alprazolam and assessed a GAF score of 58. (Tr. 1282-87.)

On December 1, 2010, Theresa Nyugen, O.D., diagnosed plaintiff with borderline intraocular pressure, immature cataracts, and presbyopia.[34] (Tr. 1275-78.)

On December 6, 2010, plaintiff complained of left ankle pain. Dr. Henderson ordered referrals to pain services and rheumatology. (Tr. 1269-73.)

On December 13, 2010, plaintiff complained of left ankle pain and reported that he had worn a moon boot during most of the days for the past two years. Dr. Toombs' impression was left ankle pain, keloids, and morbid obesity. Dr. Toombs encouraged stretching, lidocaine, and weight loss.[35] (Tr. 1264-69.)

On December 15, 2010, plaintiff complained of left ankle pain and reported Tylenol 4 as the only medication that alleviated his pain. Zarmeena Ali, M.D., assessed chronic left ankle pain and tendinitis. She noted that he had not exercised or stretched his tendons. She encouraged

---

[34] Presbyopia is the physiologic loss of the ability to focus in the eyes in advancing age. Stedman at 1556.

[35] Lidocaine is used to stop itching and pain from certain skin conditions. WebMD, http://www.webmd.com/drugs (last visited on January 23, 2013).

exercise and weight loss and found no signs of inflammatory arthritis. She recommended Tylenol 4 but advised him to stop hydrocodone or over-the-counter pain medication. She further noted pedal edema and recommended use of a compression stocking. (Tr. 1257-63.)

On February 2, 2011, Steven J. Grondalski, O.D., suspected that plaintiff had glaucoma. He assessed a mild cataracts in both eyes that did not affect plaintiff's vision, refractive error, and presbyopia. (Tr. 1250-55.)

On February 14, 2011, plaintiff complained of intermittent right upper abdominal pain that began a month earlier after he felt a pop and of further left ankle pain. Dr. Henderson ordered an ultrasound and liver function tests. He also ordered a chest X-ray, which revealed soft tissue density but no other evidence of tumor masses or infiltrate. (Tr. 1169, 1244-48.)

On March 1, 2011, plaintiff complained of neck pain and requested pain medication refills. Dr. Choi assessed chronic pain syndrome and refilled plaintiff's pain medication. He recommended acupuncture and psychiatric treatment for pain management. Isaac J. Faibisoff, M.D., indicated that neurology had little more to offer due to no indication of neurological compromise. He recommended a chiropractor, pain psychology, and acupuncture. (Tr. 1415-18.)

On March 30, 2011, plaintiff attended group therapy for coping with diabetes. Sarah K. Wahl observed plaintiff as alert and as an active participant. (Tr. 1413-14.)

On March 31, 2011, plaintiff complained of ankle, neck, and back pain. He reported that he lived with his parents and spends time with his parents and family. He noted that his mother was on life support in the hospital. He reported that he had stable mood when he can avoid stressors. Ms. Gleason found plaintiff's mood stable. (Tr. 1407-12.)

On April 5, 2011, plaintiff arrived at the emergency room, complaining of a cough that produced blood and began one week earlier. Shaukat K. Chaudhry, M.D., diagnosed acute bronchitis and prescribed azithromycin and guaifenesin.[36] Chest X-rays were negative. (Tr. 1396, 1401-05.)

On May 24, 2011, an abdominal CT revealed benign hepatic hemangiomas. (Tr. 23-24.)

On October 11, 2011, plaintiff arrived at the emergency room after his involvement as a driver in a motor vehicle collision. Peter H. Phan, M.D., diagnosed left knee laceration and

---

[36] Azithromycin is an antibiotic. WebMD, http://www.webmd.com/drugs (last visited on January 23, 2013). Guaifenesin is used to treat coughing and chest congestion. Id.

traumatic brain injury and recommended a wheeled walker. Dr. Phan discharged plaintiff on October 13, 2011. (Tr. 254-73.)

On October 17, 2011, plaintiff arrived at the emergency room, complaining of dizziness and pain since his October 13, 2011 discharge from the emergency room. A CT revealed left frontal hematoma. Bassam Albarcha, M.D., diagnosed dizziness, orthostatic hypertension, and head trauma. (Tr. 22, 246-51.)

On November 1, 2011, plaintiff arrived at the emergency room, complained that he had exhausted his supply of Xanax two days earlier. Eve Lipschitz, M.D., diagnosed anxiety disorder and depressive disorder, assessed a GAF score of 45-50, and refilled plaintiff's Xanax prescription. (Tr. 242-46.)

On December 2, 2011, Dr. Grondalski suspected glaucoma, diagnosed mild cataracts, and refractive error and presbyopia. He prescribed new glasses. (Tr. 233-37.)

On January 3, 2012, plaintiff complained of left knee pain and right ankle swelling caused by the recent motor vehicle accident. Dr. Henderson indicated that plaintiff's neck pain and abdominal pain were resolved. (Tr. 223-26.)

On January 26, 2012, plaintiff reported that he was allowed to stop wearing a cast for his right ankle and immobilizer for his left knee three days earlier but complained of pain in both areas. Lawrence G. Evans, M.D., diagnosed ruptured right Achilles tendon and left patellar fracture. He requested MRIs and recommended that plaintiff wear a boot on his right foot. X-rays of the left knee revealed no abnormalities. (Tr. 79-81.)

On February 7, 2012, plaintiff reported that his father had only two months to live due to liver cancer. Ms. Gleason observed an appropriately sad affect and assessed a GAF score of 55. (Tr. 217-22.)

On February 14, 2012, plaintiff received a cane and a wheeled walker due to his right ankle. He complained of right ankle and left knee pain. Dr. Evans noted that plaintiff used a cam walker and had plates for foot elevation, which plaintiff found painful. He recommended heel raises and instructed plaintiff to return after MRIs. (Tr. 215-17.)

On February 27, 2012, plaintiff reported that he was homeless and unemployed. He reported that he could no longer reside with his father, who he believed had one week to live. Caassandra V. Talbert informed him of walk-in shelters and financial assistance. (Tr. 214-15.)

On February 28, 2012, a left knee MRI scan revealed a displaced fracture in the lateral femur condyle, mild tricompartment osteoarthritis in the left knee with both mild and moderate chondrosis, mild bone marrow edema in the tibial plateau, possible small tear in the anterior horn of the lateral meniscus, small joint effusion, and Baker's cyst. A right ankle MRI scan revealed, a right Achilles tendon tear, moderate edematous changes in the subcutaneous soft tissues, and spur on the lateral aspect of the right talus. (Tr. 16-21.)

On March 2, 2012, Shaleen M. Robertson, LCSW, evaluated plaintiff for Housing, Employment, Recovery Opportunities (H.E.R.O.), a transitional housing program. Plaintiff reported that he had no biological children and that he slept at the residence of a family member for fifteen of the past thirty nights and slept in places not intended for habitation for the other fifteen nights. He reported that he was homeless for over a year and received food stamps. He also reported that he drank at least five drinks on fourteen of the past thirty days. Ms. Robertson concluded that plaintiff met the basic eligibility criteria and that he would benefit. (Tr. 201-11.)

On March 6, 2012, Dr. Evans diagnosed a ruptured right Achilles' tendon and fractured left lateral femoral condyles. He prescribed Percocet and recommended a CT scan of the left knee and physical therapy for the Achilles tendon. (Tr. 201.)

On March 12, 2012, plaintiff received an addiction assessment. He reported that he had been divorced for over twenty years and that his sister allowed him to stay with her until he received transitional housing. He also reported that he drank alcohol and smoked marijuana in his free time. Vincent Gaston recommended sobriety monitoring and noted plaintiff's appointment to complete documentation for the H.E.R.O. program. (Tr. 194-201.)

On March 18, 2012, a left knee CT scan revealed an oblique fracture in the lateral femur condyle, small joint effusion, mild to moderate osteoarthritis, and bursitis. (Tr. 15-16.)

On March 29, 2012, plaintiff attended physical therapy, complaining for pain in the right ankle and left knee. Plaintiff received a TENS unit and instructions for a home exercise program. (Tr. 62-69.)

On April 4, 2012, plaintiff attended physical therapy and reported that he found Percocet and the cam boot helpful. Harry Rayhel, a physical therapist, observed that plaintiff ambulated and stood with a cane. Mr. Rayhel recommended a Dynasplint for full extension of his left knee. (Tr. 184-88.)

On April 6, 2012, Dr. Evans noted gradual improvement with plaintiff's right ankle. The left knee CT scan indicated a fractured lateral condyle that had healed with some displacement. Dr. Evans recommended lifts for both heels, removing the cast, and to walk and bear weight as tolerated. (Tr. 183.)

On April 11, 2012, plaintiff attended physical therapy and reported that the heel lifts helped his right Achilles tendon but did not help his left knee. Mr. Rayhel observed a slight gain in passive knee extension. (Tr. 179-83.)

On April 18, 2012, plaintiff attended physical therapy and complained of increased left knee soreness after his last physical therapy session. Plaintiff reported improved swelling of his right ankle but no improvement in his left knee. (Tr. 174-79.)

On April 19, 2012, plaintiff reported that his father died on March 31, 2012. Ms. Gleason observed stable mood and assessed a GAF score of 55. (Tr. 167-72.)

On April 25, 2012, plaintiff attended physical therapy and complained of right heel pain. Mr. Rayhel observed edema on the left tibia and foot and that plaintiff increased his range of motion. (Tr. 163-67.)

On April 30, 2012, plaintiff reported that he did not enjoy physical therapy because it caused him pain and that he expected a new knee brace. (Tr. 157-63.)

On May 2, 2012, plaintiff attended physical therapy, reported decreased edema on the left tibia, and complained of pain caused by heel lifts. Mr. Rayhel noted plaintiff's moderate complaints during the session but no significant progress. (Tr. 150-54.)

On May 9, 2012, plaintiff attended physical therapy and reported no improvement but more ankle pain. Mr. Rayhel noted plaintiff's moderate complaints during the session and slight improvement with left knee extension. (Tr. 146-50.)

On May 10, 2012, Dr. Evans noted plaintiff's gradual improvement, including decreased swelling, and improved range of motion and strength. He also noted that plaintiff's heel inserts were replaced and recommended another X-ray of the left knee. (Tr. 145-46.)

On May 25, 2012, plaintiff attended physical therapy and reported that the Dynasplint helped his left knee. Mr. Rayhel noted improvement with the left knee range of motion. (Tr. 141-45.)

On June 11, 2012, plaintiff attended physical therapy. Mr. Rayhel noted no improvement. (Tr. 137-40.)

On June 13, 2012, plaintiff received a psychosocial assessment. He reported that he lived with his cousin and had been staying with various family members and that he never married and had no children. He worked as a quality control inspector for five years and as an automotive part factory worker for two years. He reported that although his prescription allows him to take three Percocet per day, he takes only one Percocet and one Motrin to manage his pain. Ms. Robertson concluded that plaintiff would benefit from the H.E.R.O. program. (Tr. 127-37.)

On June 18, 2012, plaintiff attended physical therapy and complained of more right heel pain. Mr. Rayhel noted no improvement and requested a consultation regarding further therapy. (Tr. 122-26.)

On July 3, 2012, plaintiff discussed his elevated A1C levels with Dr. Henderson and considered diabetes treatment. (Tr. 115, 117-20.)

On July 23, 2012, plaintiff attended physical therapy, reported increased right heel pain, and went back to wearing the cam boot. That same day, Dr. Evans noted that plaintiff's ambulation had improved and that plaintiff continued to use Dynasplint. Dr. Evans observed nearly full extension of the knee. He recommended that plaintiff continue physical therapy. (Tr. 110-15, 121.)

On August 7, 2012, plaintiff joined the H.E.R.O. program. (Tr. 8, 104-10.)

On August 14, 2012, plaintiff reported fair mood but complained of depression due to living in a shelter and awaiting a disability determination. Ms. Gleason prescribed venlafaxine and assessed a GAF of 52.[37] (Tr. 95-100.)

Also on August 14, 2012, plaintiff attended physical therapy and complained of significant, increased right ankle pain. He lost his cane and requested another one. Mr. Rayhel observed that plaintiff was not wearing his cam boot. He described plaintiff's gait as antalgic. Plaintiff rated his left knee improvement at fifty percent but found no improvement with the right ankle. (Tr. 100-04.)

On August 15, 2012, plaintiff attended a group therapy session to learn to cope with diabetes. (Tr. 93-95.)

---

[37] Venlafaxine is used to treat depression. WebMD, http://www.webmd.com/drugs (last visited on January 23, 2013).

On August 17, 2012, plaintiff complained of persistent right ankle pain and limited range of motion.  He reported that the pain increased in severity and no improvement with physical therapy.  Asifi N. Sufi, M.D., discontinued physical therapy and referred plaintiff to orthopedics. (Tr. 89-91.)

On August 24, 2012, Dr. Evans observed full extension of the left knee and recommended an MRI for plaintiff's right ankle.  (Tr. 88-89.)

On December 13, 2012, plaintiff reported that he exhausted his supply of alprazolam one week earlier.  Ms. Gleason assessed a GAF score of 50.  (Tr. 231-32.)


**ALJ Hearing**

The ALJ conducted a hearing on May 19, 2011.  (Tr. 298-316.)  Plaintiff testified to the following.  He is fifty years old and graduated from high school.  He measures five feet, eight inches, and 256 pounds.  He has a felony conviction for murder, served ten years, and left prison in 1995.  (Tr. 300, 304, 306-07.)

From 1996 to 2000, he worked at Nordyne as a quality inspector of heaters.  At Nordyne, he lifted furnaces that weighed eighty to ninety pounds.  From 2000 to 2002, he worked at Acousti-Seal as a forklift driver.  At Acousti-Seal, he lifted between fifty to ninety pounds.  From 2003 to 2005, following a change of ownership, plaintiff worked in the same position for Permacel.  From 2006 until 2008, he worked for Blackstone Consulting as a rations clerk.  His duties included unloading food from the trucks for an army cafeteria.  He last worked at Arrow Aviation as a ramp agent unloading baggage for seven months before an injury.  He received workers compensation but had also filed a lawsuit against Arrow Aviation.  (Tr. 300-03.)

He is physically unable to work due to his ankle.  He ruptured his Achilles tendon fifteen years earlier and underwent surgery.  He began using crutches or a cane two years ago.  The crutches were issued in Alaska.  He was issued a moon boot to stabilize the position of his foot to alleviate pain.  After two attempts, he did not exercise and stretch the tendons in his left leg due to excruciating pain.  He has high blood pressure, and medication occasionally controls it.  His blood pressure increases in the evening.  He also suffers anxiety attacks, panic attacks, antisocial behavior, and a sense of impending doom.  He stopped wearing an insert for his left foot due to instructions to wear a moon boot.  (Tr. 304-06.)

He goes to a pain clinic for his ankle, shoulder, neck, and head. He receives pain medication and light therapy. Pain medication includes hydrocodone and ibuprofen. Hydrocodone causes drowsiness, inability to focus, and lethargy. Panic attacks last for about hour and occur about twice per month. They cause hyperventilation, sharp pains in his arm, and blurred vision. He also suffers depressive disorder. He has crying spells with unpredictable onsets four or five times per week that last from forty-five minutes to two hours. (Tr. 307-09.)

He bathes and changes clothes only two or three times per week, and the number of meals he eats per day fluctuates between zero and two meals. The pace of these daily living activities represents a significant change caused by depression. He also has agoraphobia and cannot be in a crowded area. If too many people are at the store when he goes there with his mother, he feels an overwhelming feeling of impending doom and must seek refuge. (Tr. 309-10.)

He cannot fully extend his left arm downwards, frontwards, or upwards without pain. He can only extend his arm sixty to seventy percent of its full extension. However, he is right-handed. He elevates his foot at night to prevent swelling and pain. He also elevates his foot twice during the days for one to two hours. He sleeps for four to six hours per night and lays down during the day every day. He takes quipentine, which is intended for relaxation but does not help. Not including the time he spends sleeping, he spends eight to ten hours per day in bed because he has little to do. (Tr. 310-12.)

Vocational expert (VE) Delores Gonzales also testified at the hearing. Plaintiff worked as a forklift operator for approximately three years. Operating the forklift required him to stand. At Permacel, he worked at the assembly line and lifted several items, including car seats, bumpers, trunks, doors, and windows. (Tr. 312-13.)

The ALJ presented a hypothetical individual of plaintiff's age, education, and work experience. The hypothetical individual could lift and carry twenty pounds occasionally, ten pounds frequently, requires a sit/stand option, and can occasionally climb stairs, ramps, ropes, ladders, and scaffolds, balance, stoop, kneel, crouch, and crawl. The individual could understand, remember, and perform at least simple instructions and non-detailed tasks, demonstrate adequate judgment to make simple work-related decisions, respond appropriately to supervisors and coworkers in a task-oriented setting where contact is casual and infrequent, can adapt to routine, simple work charges, but should not work in a setting that requires regular contact with the

general public or perform work that requires more than infrequent handling of customer complaints. (Tr. 313-14.)

The VE responded that such individual could not perform plaintiff's past relevant work. However, such individual could perform as a bench assembler, which is light, unskilled work with 239,550 positions nationally and 5,700 positions in Missouri, and as a mail clerk, which is light, unskilled work with 131,750 positions nationally and 3,430 positions in Missouri. (Tr. 314.)

The ALJ altered the hypothetical individual by allowing the hypothetical individual to lift twenty pounds occasionally, ten pounds frequently, stand or walk for two hours in an eight-hour workday, and sit for six hours. The VE responded that such individual could not perform plaintiff's past relevant work. However, such individual could perform as a table worker, sedentary, unskilled work with 430,450 positions nationally and 8,610 positions in Missouri, and as a stuffer, which is sedentary, unskilled work with 338,920 positions nationally and 10,550 positions in Missouri. (Id.)

Plaintiff's counsel presented a hypothetical individual that could remain on task for only ninety percent of the day. The VE responded that employees must be on task one hundred percent of the time and that such individual could not work competitively. (Tr. 315.)


### III. DECISION OF THE ALJ

On June 22, 2011, the ALJ found plaintiff not disabled. (Tr. 280-92.) At Step One of the prescribed regulatory decision-making scheme,[38] the ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged onset date, October 1, 2008. At Step Two, the ALJ found that plaintiff's severe impairments were left Achilles tendon surgery, degenerative changes in the ankles, obesity, anxiety disorders, and panic attacks. The ALJ also found that non-severe impairments included benign hypertension and medication side effects. (Tr. 282.)

At Step Three, the ALJ found that plaintiff had no impairment or combination of impairments that met or was the medical equivalent of an impairment on the Commissioner's list of presumptively disabling impairments. (Tr. 284.)

The ALJ considered the record and found that plaintiff had the residual functional capacity (RFC) to perform light work, except that he can only occasionally climb stairs, ramps, ropes,

---

[38] See below for explanation.

ladders, and scaffolds, balance, stoop, kneel, crouch, and crawl, and requires a sit/stand option. He can understand, remember, and perform at least simple instructions and non-detailed tasks, demonstrates adequate judgment to make simple work-related decisions, respond appropriately to supervisors and coworkers in a task-oriented setting where contact with others is casual and infrequent, and adapt to routine, simple work changes. The ALJ further found that plaintiff should not work in a setting that includes regular contact with the general public or more than infrequent handling of customer complaints. At Step Four, the ALJ determined that plaintiff could perform no past relevant work. (Tr. 285-90.)

At Step Five, the ALJ found plaintiff not disabled. (Tr. 291.)

## IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. § 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets

or equals a listed impairment. 20 C.F.R. § 404.1520(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform his past relevant work (PRW). Id. § 404.1520(a)(4)(iv). The claimant bears the burden of demonstrating he is no longer able to return to his PRW. Pate-Fires, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. Id.; 20 C.F.R. § 404.1520(a)(4)(v).

## V.  DISCUSSION

Plaintiff argues that: (1) the court should remand the case to the ALJ due to new and material evidence; (2) that the ALJ failed to supported the RFC determination with substantial evidence; and (3) that because the hypothetical question presented by the ALJ did not reflect the concrete consequences of plaintiff's impairment, the VE's testimony does not constitute substantial evidence.

## A. New and Material Evidence

Plaintiff argues that the court to remand the case to the ALJ due to new and material evidence. Specifically, plaintiff refers to the evidence submitted after the issuance of the ALJ's decision. (Tr. 10-274.) "[The court] may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). However, the Eighth Circuit has instructed that:

> Once it is clear that the Appeals Council has considered newly submitted evidence, we do not evaluate the Appeals Council's decision to deny review. Instead, our role is limited to deciding whether the administrative law judge's determination is supported by substantial evidence on the record as a whole, including the new evidence submitted after the determination was made.

Riley v. Shalala, 18 F.3d 619, 622 (8th Cir. 1994).

Here, the Appeals Council considered the newly submitted evidence. (Tr. 2.) Therefore, the court's inquiry is limited to whether substantial evidence supports the ALJ's decision.

Accordingly, the court denies plaintiff's request for remand to the ALJ on the basis of newly submitted, material evidence.

## B. RFC Determination

Plaintiff argues that the ALJ did not support the physical RFC determination with substantial evidence because the results of a one-time medical evaluation do not constitute substantial evidence. Specifically, the ALJ relied on Dr. Wheeler's opinion regarding plaintiff's residual functional capacity but also determined that plaintiff required a sit/stand option. "(Tr. 290, 1137-43.) "[A] one-time medical evaluation [does] not constitute substantial evidence on which the ALJ can permissibly base his decision." Cox v. Barnhart, 345 F.3d 606, 610 (8th Cir. 2003). However, "[i]f an impairment can be controlled by treatment or medication, it cannot be considered disabling." Brown v. Astrue, 611 F.3d 941, 955 (8th Cir. 2010). The ALJ may also consider the lack of significant restrictions by medical professionals and the conservative nature of treatment. Thomas v. Barnhart, 130 F. App'x 62, 64 (8th Cir. 2005); Forte v. Barnhart, 377 F.3d 892, 896-97 (8th Cir. 2004). Additionally, the ALJ may consider his observations of claimants during hearings. Lamp v. Astrue, 531 F.3d 629, 632 (8th Cir. 2008). The ALJ based the physical RFC determination on evidence other than the opinion of Dr. Wheeler.

Regarding plaintiff's left ankle, the ALJ relied on imaging studies of the left ankle that revealed no abnormalities. (Tr. 801, 803, 1174.) The ALJ also noted that plaintiff worked for several years after the initial left ankle injury. (Tr. 300-05); see Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992) (stating that an ALJ may discount allegations of pain if a claimant has worked with an impairment for several years). The ALJ also considered that plaintiff failed to stretch the left Achilles tendon as instructed by Dr. Toombs. (Tr. 305, 1257, 1269); see Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001) (stating that the ALJ may discount allegations of pain due to failure to comply with prescribed treatment).

Regarding obesity, the ALJ found that, although medical professionals discussed weight with plaintiff, the records do not indicate that plaintiff's weight prevented him from working. (Tr. 1228-36, 1257-69); see Forte, 377 F.3d at 896-97.

Regarding plaintiff's neck, the ALJ relied on imaging studies and electrodiagnostic studies. (Tr. 658, 674, 952, 1066, 1303, 1319.) He noted that plaintiff's allegation of pain did not

correspond with his nonverbal behavior. (Tr. 288.) Moreover, on January 3, 2012, Dr. Anderson found that plaintiff's neck pain had resolved. (Tr. 223-26.)

Regarding the allegations of blurred vision, Dr. Grondalski, an optometrist, diagnosed mild cataracts and presbyopia. (Tr. 1250-55.) However, on December 1, 2010, Dr. Grondalski prescribed new glasses, and thereafter, plaintiff did not complain of, and no medical professional mentioned, blurred vision. (Tr. 233-37.)

Regarding plaintiff's allegation of arthritis in the left leg, arm, hand, and knuckles, on December 15, 2010, Dr. Ali, a rheumatologist, found no signs of inflammatory arthritis. (Tr. 1257-63.) Further, the ALJ relied on X-rays of the left hand and elbow. (Tr. 802-04.) After examination, Dr. Cason found that plaintiff's left arm joints had a normal range of motion and that his left hand had normal grip strength. (Tr. 918.)

Regarding bone spurs, although Dr. Cason's impression was that plaintiff suffered a bone spur in the left ankle, subsequent imaging studies of the left ankle revealed no bone spur. (Tr. 801, 803, 1174.) Moreover, plaintiff failed to comply with medical instructions, including failure to appear at appointments and failure to wear the moonboot. (Tr. 1033-35, 1228-36, 1334-40.) On February 28, 2012, an MRI scan revealed a bone spur in the right ankle. (Tr. 16-21.) However, the record indicates that the motor vehicle collision on October 11, 2011 caused the right ankle injury. (Tr. 223-26.) "Medical evidence obtained after an ALJ decision is material if it relates to the claimant's condition on or before the date of the ALJ's decision." Thomas v. Sullivan, 928 F.2d 255, 260 (8th Cir. 1991); see 20 C.F.R. § 404.620. The ALJ issued the decision on June 22, 2011, rendering the right ankle injury not material to the application at issue. (Tr. 280-92.)

Even excluding the Dr. Wheeler's opinion, the ALJ supported the physical RFC determination with substantial evidence. Accordingly, plaintiff's argument regarding the physical RFC is without merit.

Plaintiff also argues that the ALJ did not support the mental RFC determination with substantial evidence because the mental RFC determination does not mirror Dr. Cottone's opinion. Specifically, plaintiff argues that the ALJ did not include Dr. Cottone's opinion that plaintiff should not work in close proximity with others and that plaintiff had moderate limitations with the ability to complete a normal work schedule. (Tr. 1156-58.)

The ALJ is "not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists." 20 C.F.R. § 404.1527(e)(2)(i). Further, Dr. Cottone indicated that plaintiff could relate adequately to coworkers and supervisors, and the ALJ limited plaintiff to work excluding regular contact with the general public and more than infrequent handling of customer complaints. (Tr. 285, 1156-58.) Further, medical records do not indicate that plaintiff's mental condition prevented him from working.

Except for instances when plaintiff exhausted his supply of medication, plaintiff rarely complained of his mental condition after Ms. Gleason, plaintiff's mental health professional, prescribed alprazolam on November 10, 2010. (Tr. 95-100, 167-74, 217-22, 228-32, 242-46, 1282-87, 1407-12.) Ms. Gleason described plaintiff's mood as stable even during the time surrounding the death of plaintiff's father. (Tr. 167-74, 1407-12.) On August 14, 2012, plaintiff complained of depression due to awaiting the determination of his disability benefits and living in a shelter. (Tr. 95-100.) However, during his next visit, four months later, on December 13, 2012, plaintiff returned to Ms. Gleason only to refill his alprazolam prescription. (Tr. 228-32.)

Substantial evidence supports the mental RFC determination. Accordingly, plaintiff's argument regarding the mental RFC determination is without merit.


## C. Vocational Expert Testimony

Plaintiff argues that the ALJ erred by relying on the VE's response to a hypothetical question that failed to capture the concrete consequences of plaintiff's impairments. "Testimony based on hypothetical questions that do not encompass all relevant impairments cannot constitute substantial evidence to support the ALJ's decision." Hillier v. Social Sec. Admin., 486 F.3d 359, 366 (8th Cir. 2007). "Hypothetical questions should set forth impairments supported by substantial evidence on the record and accepted as true and capture the 'concrete consequences' of those impairments." Id.

In the ALJ's opinion, the ALJ relies on VE testimony given as a response to the ALJ's hypothetical question. (Tr. 290-91.) The hypothetical question involved an individual with an RFC that the ALJ later found to be plaintiff's RFC. (Tr. 313-14, 285.) Specifically, plaintiff argues that because substantial evidence did not support the RFC determination, the hypothetical question encapsulating that determination failed to capture the concrete consequences of

plaintiff's impairments.  However, as discussed above, substantial evidence supports the RFC determination.  Accordingly, the ALJ did not err by relying on the VE's response to a hypothetical question.

## VI.  RECOMMENDATION

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be affirmed.

The parties are advised that they have 14 days to file written objections to this Report and Recommendation.  The failure to file timely written objections may waive the right to appeal issues of fact.


<u>            /s/ David D. Noce            </u>
**UNITED STATES MAGISTRATE JUDGE**


Signed on February 25, 2014 .